IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Heywood Becker, : 
          Petitioner : 
 : 
      v. : No. 560 C.D. 2017
 : Submitted: November 3, 2017
Department of Environmental : 
Protection, : 
          Respondent : 


BEFORE:   HONORABLE RENÉE COHN JUBELIRER, Judge
             HONORABLE P. KEVIN BROBSON, Judge
             HONORABLE DAN PELLEGRINI, Senior Judge


OPINION NOT REPORTED


MEMORANDUM OPINION BY
SENIOR JUDGE PELLEGRINI         FILED: December 1, 2017


        Heywood Becker (Becker) petitions for review *pro se*[1] from an order of the Environmental Hearing Board (Board) dismissing his appeal from the Commonwealth of Pennsylvania Department of Environmental Protection's (Department) decision that he rerouted a stream channel without a permit and

---

[1] Becker was cited as the trustee for Center Bridge Trust and in his Petition for Review states that he is here as a trustee of that trust. He is not represented by an attorney. We have already had occasion to determine whether another purported "trust" created by Becker could be represented by him *pro se*. *See Straban Township v. Hanoverian Trust*, (Pa. Cmwlth., No. 1935 C.D. 2015, filed Sept. 16, 2016) 2016 WL 4937885. We determined that because Becker was the sole beneficiary and trustee of that purported trust, he did not create a valid trust pursuant to Section 7732(a)(5) of the Uniform Trust Act, 20 Pa.C.S. § 7732(a)(5), and could represent the purported "trust" *pro se*.

caused sediment pollution to waters of the Commonwealth in violation of the Clean Streams Law[2] as well as the Dam Safety and Encroachments Act (DSEA).[3] On appeal, he contends the Board erred because the channel that he rerouted is not a "stream" as defined under those laws. For the following reasons, we affirm the Board's determination that Becker unlawfully rerouted an existing stream channel without a permit and caused sediment pollution to waters of the Commonwealth, but remand the matter to the Board to fashion a more appropriate remedy.

**I.**

The Center Bridge Trust (Trust), whose sole trustee is Becker, is the former owner of property located at 7072 Upper York Road in Solebury Township, Bucks County, Pennsylvania (Property). It is approximately 0.13 acres and consists of an uninhabited house with a gravel driveway, as well as a stream that traverses the Property with a drainage area for over 250 acres. The stream eventually discharges into the Delaware Canal and River.

On June 29, 2011, and April 23, 2012, the Department, through the Bucks County Conservation District (Conservation District),[4] conducted inspections of the Property, after which Earth Disturbance Inspection Reports were

---

[2] Act of June 22, 1937, P.L. 1987, *as amended*, 35 P.S. §§ 691.1–691.1001.

[3] Act of November 26, 1978, P.L. 1375, *as amended*, 32 P.S. §§ 693.1–693.27.

[4] Pursuant to 25 Pa. Code § 102.41(a), "[t]he Department may delegate by written agreement the administration and enforcement of this chapter to conservation districts if they have adequate and qualified staff, and are, or will be, implementing the program identified in the delegation agreement."

issued alleging, *inter alia*, that the Trust, by depositing gravel within 50 feet of a stream bank, rerouted a stream channel without a permit or authorization.[5] Following those inspections, Becker submitted an erosion and sediment control plan application to the Conservation District for a project named "Becker Drainage

[5] Specifically, the June 29, 2011 Earth Disturbance Inspection Report provides:

> 1. EARTH DISTURBANCE ON SITE. GRAVEL DRIVEWAY INSTALLED THAT TAKES ACCESS OFF OF SR 263 AND WRAPS BEHIND HOUSE TO STREAMBANK. GRAVEL HAS BEEN DUMPED WITHIN 50' OF STREAMBANK. 2. APPEARS THAT OTHER GRADING WORK DONE AROUND HOUSE AND UP TO STREAM BANK. 3. SITE DISTURBANCE EXCESS 1,000[SQ.] FT. NO EROSION CONTROL PLAN APPROVED, NO EROSION CONTROLS INSTALLED. 4. **FAILURE TO DEVELOP, IMPLEMENT AND MAINTAIN AN ADEQUATE EROSION CONTROL PLAN.** 5. FAILURE TO INSTALL AND MAINTAIN EROSION CONTROLS. 6. FAILURE TO OBTAIN APPROVALS/WAIVERS FROM [THE DEPARTMENT] FOR ENCROACHMENTS.

(Department Exhibit 2A) (emphasis added). The April 23, 2012 Report provides:

> 1. STREAM CHANNEL HAS BEEN MOVED WITH HEAVY EQUIPMENT. SEDIMENT, DIRT, ROCKS ARE IN STREAM CHANNEL. FAILURE TO OBTAIN PERMITS FROM [THE DEPARTMENT] AND THE BUCKS COUNTY CONSERVATION DISTRICT FOR EARTHMOVING ACTIVITIES AND DISTURBANCE OF STREAM CHANNEL. 2. SITE IS NOT TEMPORARILY STABILIZED. FAILURE TO PROVIDE TEMPORARY STABILIZATION. 3. **FAILURE TO DEVELOP, IMPLEMENT AND MAINTAIN AN ADEQUATE EROSION CONTORL PLAN.** 4. FAILURE TO PREVENT SEDIMENT POLLUTION TO WATERS OF THE COMMONWEALTH. NOTICE OF VIOLATION.

(Department Exhibit 2B) (emphasis added).

Swale Improvement." (DEP Exhibit No. 10.) However, because no erosion and sediment controls were contained in this application – *i.e.*, silt fence, construction entrance, sediment basin, sediment traps, seeding and mulching – and because there was no information on how the site would be stabilized, on May 18, 2012, the Conservation District issued a letter disapproving the application.

In May 2012, an enforcement meeting between all interested parties was held to discuss how the site would be remediated as well as potential civil penalties. At that meeting, the parties discussed the lack of stabilization of the Property, the unpermitted relocation of the stream channel, and what was needed for the site to come back into compliance. As a result of this meeting, Becker was to submit an application and plans for the stabilization of the site and the restoration of the stream channel, and otherwise bring the site into compliance with the applicable statutory and regulatory requirements.

However, because the Conservation District never received an application or any plans following the enforcement meeting, on November 2, 2012, a follow-up inspection of the Property occurred after which the Trust was cited for:

> 1. FAILURE TO RESPOND TO PREVIOUS INSPECTION REPORTS AND STIPULATIONS OF ENFORCEMENT MEETING HELD ON 5/24/12. 2. CONSERVATION DISTRICT HAS NOT HAD ANY COMMUNICATION WITH LANDOWNER, NOR HAS THE CONSERVATION DISTRICT RECEIVED AN ADEQUATE[6] EROSION CONTROL PLAN FOR THE

---

[6] Although the Trust submitted an erosion control and sediment plan to the Department prior to the enforcement meeting, it was deemed "INADEQUATE for erosion and sediment **(Footnote continued on next page…)**

4

SITE.  3. HEAVY ACCUMULATIONS OF SILT STILL REMAIN IN STREAM CHANNEL.  DAMAGED SILT FENCE STILL REMAINS WRAPPED AROUND TREES AND ACCUMULATED DEBRIS.  4. FAILURE TO DEVELOP AND IMPLEMENT AN ADEQUATE EROSION CONTROL PLAN.

(Supplemental Reproduced Record (S.R.R.) at 234b[7]) (footnote added).

Significantly, before the Department could issue a compliance order based upon the November 2012 inspection report, on December 11, 2012, the Trust's ownership in the Property was forfeited by upset tax sale and Peter Edwardson (Edwardson) became the owner of the Property.

Purportedly unaware of that upset tax sale, on February 23, 2013, the Department then issued a compliance order to Becker and the Trust, directing them to:  (1) stabilize disturbed areas on the Property by, *inter alia*, applying seed and mulch at three tons per acre; (2) implement Best Management Practices (BMP) relating to control of each disturbance runoff on the Property; (3) submit an application for a permit, including a stream restoration plan, to place the stream into its original location and restore the impacted aquatic habitat; (4) submit an

_____

**(continued…)**

pollution control and does not meet the minimum requirements of the [Department's] Rules and Regulations, Chapter 102 Erosion Control, relating to the Pennsylvania Clean Streams Law." (DEP Exhibit 11, Letter from Bucks County Conservation District dated May 18, 2012.)

[7] Because the Department failed to include any form of pagination for the Supplemental Reproduced Record, we have assigned the pages their respective numbers.

erosion and sediment control plan for all work associated with the restoration plan; (5) implement the stream restoration plan; and (6) permanently stabilize the Property. Becker appealed that compliance order and a *de novo* hearing was held before the Board.

## II.

## A.

At the hearing, the Department offered the testimony of Lisa Dziuban (Inspector Dziuban), who has worked as an environmental protection specialist II at the Conservation District since 1985. Inspector Dziuban testified that she inspected the Property on June 29, 2011, at the request of Solebury Township's Manager. During that inspection, she observed a stream channel on the Property with a defined bed and banks. Near that stream channel was evidence of an earth disturbance, including earth moving and grading around the back and to the side of the house, as well as the installation of a new driveway and gravel piled within 50 feet of the stream, which could be carried downstream when there was a flood or major rain event. She stated that there were no erosion or sediment controls installed and/or approved for the earth disturbance work on the Property to prevent that from happening.[8] A June 29, 2011 photograph taken of the Property was

---

[8] Inspector Dziuban further explained:

> [An erosion and sediment control plan] is a depiction of the site prior. It shows different aspects. It shows prior condition and what the applicant is proposing as far as grading and earth moving. And then it shows the specific erosion controls that are to be installed for whatever they're proposing and that those controls meet the requirements of what they're proposing, depending on how much they're disturbing, depending on if there's steep slopes,

**(Footnote continued on next page…)**

6

entered into evidence corroborating Inspector Dziuban's testimony that there was a stream channel on the Property with a defined bed and banks as well as gravel piled within 50 feet of it.

Inspector Dziuban then testified that she also inspected the Property on April 23, 2012, in response to several complaints "about heavy equipment [on the Property] moving a stream . . . ." (N.T. 04/14/2014 at 57.) This time, Brendan Ryan (Officer Ryan), a conservation officer with the Pennsylvania Fish and Boat Commission since 2006, accompanied her. At the time of the April 2012 inspection, no permit had been issued for relocating or rechanneling the stream and no plan was in place to control erosion and sediment.

During the April 2012 inspection, Inspector Dziuban and Officer Ryan observed that the stream channel had been recently moved via heavy equipment as evidenced by the presence of large tire tracks. The Property was extremely unstable, with mud and loose soil prevalent throughout, and turbid water

------

**(continued…)**

> depending on if there's a . . . stream nearby or watercourse nearby, if there are wetlands nearby.
>
>        * * *
>
> The point of the erosion control plan is to prevent undue sedimentation to the waters of the [C]ommonwealth. That's the bottom line.

(N.T. 04/14/2014 at 39, 41.)

was present in the Property's stream channel and eroded banks, which presents a danger of pollution to waters of the Commonwealth. Apart from an unmaintained silt fence wrapped around a tree, there were no erosion and sediment controls or BMPs in place.[9]

Inspector Dziuban offered testimony and corroborating photographs demonstrating that there was ample water flowing in the rerouted stream channel on April 23, 2012, which had a defined bed and bank. She also offered photographs and testimony demonstrating that a connected stream channel 25 to 30 yards upstream from the Property had ample water that was not cloudy, turbid or otherwise impacted by sediment pollution. She testified that she conducted her last inspection of the Property on November 2, 2012, which was a week or two after Hurricane Sandy affected the area. She stated that during that inspection, the Property was still highly unstable – there was loose soil throughout the site, silt and sediment loading in the channel, very muddy conditions, which she considered evidence of water in the stream, no erosion and sediment controls, and the silt

---

[9] BMPs are "[a]ctivities, facilities, measures, planning or procedures used to minimize accelerated erosion and sedimentation and manage stormwater to protect, maintain, reclaim, and restore the quality of waters and the existing and designated uses of waters within this Commonwealth before, during, and after earth disturbance activities." 25 Pa. Code § 102.1. Persons proposing or conducting earth disturbance activity must develop, implement, and maintain BMPs. 25 Pa. Code § 102.2. These BMPs are required regardless of the size of the earth disturbance. 25 Pa. Code § 102.4(b)(1). In addition, measures must be undertaken to stabilize the site once earth disturbance activity is completed or when it temporarily ceases. 25 Pa. Code § 102.22. This involves the restoration or replacement of topsoil or the implementation of other measures to amend, seed or mulch the soil to protect it from accelerated erosion and sedimentation. *Id.*

fence first observed during the April 2012 inspection was still wrapped around the same tree.

## B.

The Department also offered the testimony of Frank DeFrancesco (DeFrancesco), a compliance specialist in the Waterways and Wetlands program at the Department's Southeast Regional Office. DeFrancesco testified that on March 19, 2013, he inspected the Property to see if Becker complied with the compliance order. During that inspection, he observed that the Property was generally in a disturbed state; no erosion and sediment controls or BMPs were in place to stabilize the banks of the stream channel. He testified that the relocated stream channel on the Property contained water at the time of the inspection, and that water was undercutting the bank of the stream channel causing erosion. In some areas, the water appeared to be following the path of the original channel instead of the path of the relocated channel. During his most recent inspection of the Property on April 9, 2014, he observed that there had been some stabilization, but it was still inadequate. The Property was generally unstable; all stream channel embankments were undercut from water hitting the base of the unstable stream channel, causing erosion. The relocated stream channel was being recut by water flowing in the path of the original stream channel.

## C.

Finally, the Department offered the testimony of Officer Ryan who testified that he visited the Property with Inspector Dziuban on April 23, 2012, as

well as the next day with a Department biologist by the name of Randy Brown. Less formally, he also observed the Property from afar while driving on Route 263.

Officer Ryan testified that when visiting the Property, he observed that the onsite watercourse had been diverted. He also observed freshly disturbed soils immediately adjacent to the channel, which could cause accelerated erosion during a rain event and, in turn, turbidity in the water. He explained that accelerated erosion is problematic to aquatic life in a watercourse because it "causes turbidity in the water[,] which certainly would affect fish life. . . . [S]ediment is a pollutant, and sediment as a pollutant is deleterious to fish life." (N.T. 05/08/2014 at 400-401, 407.)

### D.

Following the Department's case-in-chief, Becker then testified about the current state of the channel on the Property and the reasons for its relocation. As pertinent, Becker testified that the channel was "almost always dry," and he "never believed [it] to be a stream." (N.T. 05/08/2014 at 488-90.) In support of that testimony, Becker presented a calendar at the hearing that he purportedly maintained during 2013, which indicates that the channel had water flowing in it only six days in 2013. (*Id.* at 543, 550.) However, when pressed on cross-examination, Becker conceded that he did not visit the site every single day, but instead every Saturday, Sunday and Wednesday, as well as "most other days," and any day that it was raining. (*Id.* at 569-70.)

Significantly, while photos taken during the March 19, 2013 inspection show water flowing in a defined channel on the Property, Becker's calendar does not reflect water being observed on this date, although it does reflect water was observed on the following day, March 20, 2013.

Regarding the relocation of the channel, Becker explained that although the channel previously had stonewalls on both sides, they were washed away by Hurricane Irene in 2011. Because he needed to re-route the channel, he engaged

> an excavation contractor [to] come on to the property to dig a new storm channel because I knew that, when more rains came now that the defined channel that had been there historically, this stone-laid channel that made these two right bends was gone, that water would go anywhere seeking its own course.

(*Id.* at 491.) He further admitted on cross-examination, "the only time. . . I had any piece of what might be called machinery on the site was on September 10th when I had an ordinary sized backhoe begin to dig a channel." (*Id.* at 540.)

**III.**

Following the hearing, the Department requested from the Board a stay because it was in discussions with the current owner of the Property, Peter Edwardson, who had also been cited and also filed an appeal with the Board. *See Edwardson v. Department of Environmental Protection*, EHB Docket No. 2014-029-M (Dec. 7, 2015). The Department stated that these discussions might open a path to settlement of both Becker's appeal and Edwardson's appeal. For more than

11

a year, the Board continuously granted extensions to the Department based upon the representation that progress was being made on a settlement that would resolve both of the appeals. However, this long-promised settlement never materialized.

Finally, on December 7, 2015, the Board dismissed Edwardson's appeal because it was untimely filed. *See Edwardson v. Department of Environmental Protection*, EHB Docket No. 2014-029-M (Opinion, Dec. 7, 2015). In that decision, the Board made the following relevant observations:

> The Appellant, Mr. Peter Edwardson, filed an appeal of the Department's February 11, 2014 Order, which directed Mr. Edwardson to undertake certain restoration measures concerning realignment of a stream channel located on Mr. Edwardson's property in Solebury Township, Pennsylvania. . . .
>
> **Notwithstanding his appeal, Mr. Edwardson complied with certain portions of the Department's Order. On January 8, 2015, Mr. Edwardson obtained coverage under a [National Pollution Discharge Elimination System] general permit for restoration of the stream channel, and on April 17, 2015, the Bucks County Conservation District approved Mr. Edwardson's Erosion and Sedimentation Control Plan for restoration work related to the stream channel.**
>
> The Parties subsequently executed a Consent Order and Agreement on May 22, 2015 ("CO&A") to attempt to resolve the appeal without further litigation. The CO&A set a June 30, 2015 deadline for completion of the stream channel restoration. On September 4, 2015, the Department inspected the site in question and determined that Mr. Edwardson had not completed the work to restore the stream channel in accordance with the terms of the CO&A.

[Mr. Edwardson's] inability to complete the stream restoration work under the CO&A prompted the Parties to return to litigation. . . .

The Department did not contest Mr. Edwardson's assertion that he had no legal interest in the property in question prior to his purchase of the property in 2013 in a tax sale. The Department, in fact, pursued an enforcement action against the prior owner of the property. According to the Department, prior to the tax sale, Heywood Becker, doing business on behalf of the Center Bridge Trust, owned the site. In 2011 and 2012 the Bucks County Conservation District allegedly observed Mr. Becker placing gravel in the stream bank adjacent to the site as well as his alleged unpermitted rerouting of the stream adjacent to the site. These activities, according to the Department, constitute an encroachment, as defined in 25 Pa. Code § 105.1, and were supposedly conducted without a permit required by 25 Pa. Code § 105.11(a). As a result of these statements of the Bucks County Conservation District, the Department issued Mr. Becker an Order which he appealed to the Board. This appeal is also pending before the Board.

The Department believes that Mr. Edwardson's acquisition and ownership of the property in question is sufficient to create liability because []Mr. Edwardson has not obtained a permit for the operation and maintenance of the existing onsite encroachment [on the property he acquired in the tax sale in 2013] in violation of 25 Pa. Code § 105.11(a) and Section 693.6(a) [*sic*] of the [DSEA], 32 P.S. § 693.6(a).[] Mr. Becker allegedly rerouted the stream prior to Mr. Edwardson's acquisition of the property, and this activity, according to the Department, constitutes the "existing onsite encroachment."

13

*Edwardson v. DEP*, EHB Docket No. 2014-029-M (Opinion, Dec. 7, 2015) (citations omitted, emphasis added). The Board's dismissal of Edwardson's appeal meant that the Department's compliance order was final.

Soon thereafter, the Board lifted the stay in Becker's appeal and once again set a schedule for the filing of post-hearing briefs. While the Department filed its brief on January 13, 2016, the day prior, Becker filed a motion to reopen the record to introduce what he argued was newly discovered evidence that would moot the allegations in the Department's compliance order. Specifically, Becker claimed that Edwardson had told him that a staff person of the Department had been on the site recently, and had stated to Edwardson that the stream channel at issue had been stabilized and there appeared to have been no man-made changes to the channel. Ultimately, on January 21, 2016, the Board denied the motion, after which Becker filed a motion for reconsideration, which was also denied.

On February 11, 2016, Becker filed a request to certify those two orders for interlocutory appeal as well as a continuance request for filing his post-hearing brief. The Board denied both requests. (*See* R. Item Nos. 21 & 22.) Becker then filed a petition for review with this Court, which was quashed on December 19, 2016, because it was not taken from a final, appealable order and the Trust did not satisfy the requirements for an appealable collateral order. *See Becker v. Department of Environmental Protection*, (Pa. Cmwlth., No. 401 C.D. 2016, filed Dec. 19, 2016) 2016 WL 7335827.

Finally, on April 10, 2017, the Board issued a decision and order dismissing Becker's appeal, concluding that a regulated stream exists on the Property as the term "stream" is defined under Pennsylvania law, and that the alleged violations were committed. Notwithstanding Becker's continuous objection that the Trust was not, in fact, the present owner of the Property, the Board concluded that "[t]he Department has the authority to order him to abate the nuisance regardless of his relationship to the property." (Board's Decision at 31.) This appeal followed.[10]

## IV.

On appeal, Becker does not dispute the alleged violations cited in the Department's compliance order, *per se*. Rather, he only contends that the Board erred when determining that the Department had authority to regulate his alleged conduct with regard to the channel on the Property because the channel is not a "stream" as defined under Pennsylvania law.

Under the Clean Streams Law and its regulations promulgated at Chapter 102 of Title 25 of the Pennsylvania Code, the Department has the authority to issue orders to prevent the pollution of waters of the Commonwealth, which are defined very broadly to include, among other things, "any and all rivers, streams . . . or parts thereof." Section 1 of the Clean Streams Law, 35 P.S. § 691.1;

---

[10] "Our scope of review of an order of the Board is whether the Board committed an error of law or a constitutional violation, or whether any necessary findings of fact are not supported by substantial evidence." *The Ainjar Trust v. Department of Environmental Protection*, 806 A.2d 482, 487 (Pa. Cmwlth. 2002).

15

*see also* 25 Pa. Code § 102.1 (defining "Waters of this Commonwealth" as "Rivers, streams, creeks, rivulets, impoundments, ditches, watercourses, storm sewers, lakes, dammed water, wetlands, ponds, springs and other bodies or channels of conveyance of surface and underground water, or parts thereof, whether natural or artificial, within or on the boundaries of this Commonwealth."). Section 401 of the Clean Streams Law further provides:

> It shall be unlawful for any person or municipality to put or place into any of the waters of the Commonwealth, or allow or permit to be discharged from property owned or occupied by such person or municipality into any of the waters of the Commonwealth, any substance of any kind or character resulting in pollution as herein defined. Any such discharge is hereby declared to be a nuisance.

35 P.S. § 691.401. Pollution under the Clean Streams Law includes sediment pollution. *See Leeward Construction v. Department of Environmental Protection*, 821 A.2d 145, 147 (Pa. Cmwlth. 2003) ("Sediment-laden runoff is defined as pollution in Section 1 of The Clean Streams Law. . . .").

The DSEA, similar to the Clean Streams Law, provides the Department's statutory authority for Chapter 105 regulations governing water obstructions and encroachments, the scope of which is broadly delineated to include "[a]ll water obstructions and encroachments . . . located in, along, across or projecting into **any watercourse**, floodway or body of water, whether temporary or permanent." Section 4 of the DSEA, 32 P.S. § 693.4 (emphasis added). The DSEA defines a "Watercourse" or "stream" as "[a]ny channel of conveyance of surface water having a defined bed and banks, whether natural or artificial, **with**

16

**perennial or intermittent flow**." Section 3 of the DSEA, 32 P.S. § 693.3 (emphasis added). The DSEA's state-level permitting requirements apply in an equally comprehensive fashion. *See id.* at § 693.6(a) ("No person shall construct, operate, maintain, modify, enlarge or abandon any dam, water obstruction or encroachment without the prior written permit of the [Pennsylvania Department of Environmental Protection]."); *id.* at § 693.3 (defining "water obstruction" to include any pier, wharf, abutment or any other structure located in, along, across, or projecting into any watercourse).

Focusing on the clause "with perennial or intermittent flow" contained in the DSEA's definition for "stream," Becker contends that the channel on the Property does not fall within the Department's regulatory authority. According to Becker, this is because evidence and testimony offered by him to the Board, which it allegedly "disregarded," demonstrates that "[n]o flowing water was observed in the subject swale except immediately after a very large rain event. It was an extraordinary event when water was flowing. Otherwise, there was no flowing water." (Becker's Brief at 12.)[11]

Contrary to his assertion, the Board's decision demonstrates that it did not disregard Becker's testimony or the calendar he submitted, but rather its determination was grounded in witness credibility, weight of the evidence, and the

---

[11] In support of this contention, Becker reasserts that the Board should have excluded certain photographs because they were acquired through an unconstitutional search of the Property. However, that contention must fail because our Supreme Court has refused to apply the exclusionary rule in the civil context. *See Kerr v. Pennsylvania State Board of Dentistry*, 960 A.2d 427 (Pa. 2008).

resolution of evidentiary conflicts. Such determinations are within the Board's sole discretion. *Brockway Borough Municipal Authority v. Department of Environmental Protection*, 131 A.3d 578, 587 (Pa. Cmwlth. 2016). Moreover, as the Board thoroughly and cogently explained:

> Becker vigorously contends in his post-hearing brief that the channel on his property is at most an ephemeral stream. He argues that unless a stream is intermittent or perennial it is not regulated by the Department. To Becker, this means that there must be observable water in the channel for certain threshold numbers of days per year. Becker has not offered any legal argument on the ways in which ephemeral streams differ from intermittent or any other streams under Pennsylvania law. Instead, he cites to various pieces of scientific literature and offers that ephemeral streams flow even more infrequently than intermittent streams – having "measurable discharges" less than 10% of the time. Those features possessing measurable discharges 10% to 80% of the time are intermittent streams, according to Becker, and those possessing measurable discharges more than 80% of the time are perennial.
>
> After viewing the evidence presented at the hearing on the merits, we agree with the Department that an intermittent stream regulated under the laws of this Commonwealth exists on the site. Evidence derived from the Department and Conservation District inspections, including photographs and the testimony of the inspectors, shows a channel of conveyance of surface water with a defined bed and banks and intermittent flow.
>
> [Inspector] Dziuban of the Conservation District observed a channel with defined bed and banks, albeit without flow, during her June 2011 inspection before the site was disturbed. Subsequent inspections reveal observable water flowing in the stream channel on April 23, 2012, March 19, 2013, and April 9, 2014. During the April 23, 2012 inspection, both [Inspector] Dziuban and

18

Officer Brendan Ryan of the Fish and Boat Commission observed ample water flowing in a channel with a defined bed and bank on the site. In addition, there was water flowing in the connected stream channel 25 to 30 yards upstream on the adjacent property. There was also evidence of water having flowed in the stream channel at the time of the November 2, 2012 inspection due to the presence of sediment load in the channel and overall muddy conditions. There was also ample water flowing in the defined bed and banks of the stream channel during the Department's inspection on March 19, 2013. Water was undercutting the banks of the relocated channel causing erosion. The water in some areas appeared to be following the path of the original stream channel instead of the path of the relocated channel. Water can also be observed in the defined stream channel during the Department's April 9, 2014 inspection and there was also evidence at that time of water having recut the channel.

Becker asserts that the Department and Conservation District just happened by coincidence to observe the channel soon after rain events. Becker counters that he observed the property continuously in 2013 to document the days on which the channel had water flowing in it. He presented a calendar at the hearing that he maintained during 2013 where he has indicated the days on which he observed flow. He testified that the channel had water flowing in it only six days in 2013. However, when pressed on cross-examination Becker conceded that he did not visit the site every single day. He stated he visited the site every Saturday, Sunday, and Wednesday, as well as "most other days," and any day that it was raining. However, we are not convinced of the calendar's accuracy. For instance, photos taken during the Department's inspection on March 19, 2013 show water flowing in a defined channel on the property. Notably, Becker's calendar does not reflect water being observed on this date, although it does reflect observed water on the following day, March 20. Accordingly, we cannot view Becker's calendar as an accurate representation of when water was present in the channel during 2013.

> Based on the evidence presented, we conclude that the channel at issue on Becker's property satisfies the definitions of a regulated stream under the Clean Streams Law and the Dam Safety and Encroachments Act. The stream on Becker's property is a channel of conveyance of surface water with defined bed and banks and intermittent flow.

(R. Item No. 26, Board's April 10, 2017 Opinion at 16-18) (citations omitted).

Accordingly, it is clear that substantial evidence supports the Board's determination that the channel on the Property constitutes a "stream" under the Clean Streams Law and the DSEA.

## V.

Finally, Becker contends that the Board cannot require him to make corrections on the Property because it is undisputed that the Trust was no longer the Property's owner when the compliance order was issued. To this, the Department cites to numerous cases supporting the proposition that a subsequent transfer of property does not eliminate the liability of the person who creates a nuisance on the property. *See, e.g.*, *Ryan v. Department of Environmental Resources*, 373 A.2d 475, 476 (Pa. Cmwlth. 1977) (requiring a former tenant of a property to abate a nuisance condition when there was a negotiated consent order with the owner of the property to allow him to enter that property and perform the work). While that may be so, that does not mean that an agency – or court for that matter – can effectively force a party to trespass when that property's owner has not given consent and/or has not participated in the proceedings.

20

Accordingly, because the record demonstrates that separate compliance orders have been issued against Becker, as sole trustee of the Trust, and Edwardson, and it is unclear what corrections have already been made by Edwardson, the Board's order is affirmed but we remand the matter to the Board for the limited purpose of either imposing on Becker an alternative remedy – *e.g.*, imposing on him the cost of remediation – or obtaining permission from Edwardson to permit the work to be done, as well as coordinating enforcement of the two separate, final orders.

_____
DAN PELLEGRINI, Senior Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Heywood Becker,                          :
                    Petitioner           :
                                         :
          v.                             : No. 560 C.D. 2017
                                         :
Department of Environmental              :
Protection,                              :
                    Respondent           :

# **O R D E R**

AND NOW, this 1<u>st</u> day of <u>December</u>, 2017, it is hereby ordered that the order of the Environmental Hearing Board dated April 10, 2017, is affirmed and the matter is remanded for further proceedings consistent with this opinion.

Jurisdiction relinquished.

_____
DAN PELLEGRINI, Senior Judge